# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE
CITY OF CINCINNATI,
    Plaintiff

Case No. 1:08-cv-860
Weber, J.
Hogan, M.J.

vs

MARTIN WILHELMY, et al.,
    Defendants

**REPORT AND RECOMMENDATION**

Plaintiff, the Board of Education of the City School District of the City of Cincinnati (CPS), brings this appeal pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401, et seq. Defendants are Martin and Dagmar Wilhelmy, the parents of C.W., a child with a disability as defined in the IDEA. Pursuant to the IDEA, CPS proposed an Individualized Education Plan for C.W. for the 2007-2008 academic year with which her parents disagreed. After a due process hearing requested by C.W.'s parents, the Independent Hearing Officer issued a decision in favor of C.W.'s parents. CPS appealed to a State Level Review Officer who affirmed the decision below. Thereafter, CPS filed this action in federal court seeking judicial review of the state administrative decision. *See* 20 U.S.C. § 1415(i)(2)(A). This matter is before the Court on the briefs of the parties pursuant to the Order of the Court. (Docs. 12-15). For the reasons that follow, the Court concludes that the 2007-2008 Individual Education Plan proposed by CPS failed to provide C.W. with a free appropriate public education under the IDEA and recommends the decision of the State Level Review Officer be affirmed.

## FINDINGS OF FACT

1. C.W. resides with her parents in the Cincinnati Public School District.

2. C.W. has a disability as defined in the IDEA. C.W. has moderate to severe bilateral hearing loss greater than 50 dB in each ear. (CPS Ex. 19).

3. At the age of three, when C.W. was still not communicating verbally, her pediatrician referred her to Cincinnati Children's Hospital for testing. (Tr. 17-18). C.W. was diagnosed with moderate to severe hearing loss. The staff at Cincinnati Children's Hospital recommended C.W. receive intensive audiological services to enable C.W. to learn to speak as quickly as possible. (Tr. 19-20).

4. There are primary learning language years. Ages birth to three are the most critical. Ages three to five are the next most critical. (Tr. 378). A child identified as hearing impaired at the age of three is considered at risk for speaking orally because "the language learning opportunity clock is ticking." (Tr. 173). As explained by Maria Sentelik, the executive director of Ohio Valley Voices, a school for hearing impaired children, "The brain is more willing to accept new concepts, ideas between the age of zero and three. And you have about zero to five, when there's a potential to be able to reach that child's potential. After about the age of five, you are losing time and the brain isn't so willing to accept the new information, they're not going to learn as well." (Tr. 173).

5. At three years and three months of age, C.W. received binaural hearing aids. (CPS Ex. 20).

6. In October 2005, C.W. enrolled at Ohio Valley Voices (OVV) when she was three years and four months old. (Tr. 23).

7. Ohio Valley Voices is a private, non-residential school for children with hearing impairments licensed by the Ohio Department of Education. OVV operates a preschool program through second grade (from infant to age eight). (Tr. 160). OVV's mission is is to teach deaf and hearing

2

impaired children to speak and communicate orally and without sign language. (Tr. 135, 160, 162, 166). OVV provides intensive speech and language therapy to develop language skills aimed at closing the gap between a child's actual communication level and the child's learning or academic potential. (Tr. 171-76). OVV's purpose is to prepare hearing impaired children for transition into a regular classroom as soon as their language level permits. (Tr. 133, 164). As explained by the executive director of OVV, "[O]ur goal is to get them back into their public school or the school of the family's choice by kindergarten or first grade, so they can be integrated with their hearing agemates and participate in the community." (Tr. 165).

8. Ohio Valley Voices has three speech/language pathologists, an audiologist, and an oral/deaf educator on staff. (Tr. 165). In 2008, OVV had an enrollment of 43 children. (Tr. 164).

9. The Wilhelmy's paid the cost for C.W. to attend OVV for the 2005 school year. (Tr. 282).

10. In the Fall of 2006, CPS conducted a Multi-Factored Evaluation (MFE) and prepared an Individual Education Plan for C.W. (CPS Exs. 3-8, 10). The MFE included an audiologic assessment by Susan M. Almer, an audiologist with CPS. The assessment revealed a hearing impairment of greater than 55 dB in each ear which qualified C.W. for preschool disability services. (CPS Ex. 8). It was noted that C.W. wore her hearing aids all day with few exceptions. The amplification did not remediate C.W.'s hearing loss, but only increased the loudness of sounds. In group instructional settings, C.W. needed preferential seating and appropriate lighting to provide access to visual information (speech-reading, visual cues, visual teaching aids, video materials); reiteration of verbal responses from students by the teacher to assist in following classroom conversations; and a quiet non-reverberative acoustic environment to reduce noise and reverberation of sound that interferes with speech discrimination. *Id.*

3

11. C.W.'s 2006 MFE also included a Communication Assessment by Joann Verville Long, a CPS Speech Language Pathologist. (CPS Ex. 8). Ms. Long reported that C.W.'s communication skills were significantly delayed when compared to those of typically developing peers. Ms. Long noted that C.W. needed to expand her receptive and expressive language skills. She recommended speech sounds be taught with the use of visual aids (mirror) and tactile cues to help C.W. hear, see, and feel the placement of her lips, tongue, teeth, and cheeks for target sounds. *Id.*

12. Betty Fink, a CPS teacher/service coordinator, assessed C.W. for communication, gross/fine motor skills, social-emotional behavior, adaptive behavior, and cognition. (CPS Ex. 8). C.W.'s communication and hearing skills were delayed when compared to skills of typically developing peers. Fink recommended that C.W. be provided an appropriate amplification system in situations with background noise, seating in close proximity to the primary instructor, and appropriate lighting to provide access to visual information such as speech-reading and visual teacher aids. Fink also opined that a quiet acoustic environment would help reduce noise that interferes with speech discrimination. She recommended that C.W. be provided with a developmentally appropriate preschool curriculum with daily opportunities to interact with age-mates and that C.W. participate in stimulating individual and group activities and play. *Id.*

13. The 2006 Evaluation Team Report concluded that C.W.'s hearing and communication skills were significantly delayed when compared to typically developing peers. The Report noted that C.W.'s disability was not a result of lack of instruction in reading or math and was not due to limited English proficiency. The Team determined that C.W.'s hearing impairment adversely affected her educational performance and recommended that C.W. be provided speech therapy

4

and audiological services. (CPS Ex. 8).

14. C.W.'s 2006-2007 Individual Education Plan (IEP) identified four specific needs requiring

specially designed instruction:

> 1. C.W. needs to improve her receptive and expressive language skills. She has some difficulty formulating responses, answering questions and telling how objects are used.

> 2. C.W. needs to improve her listening ability to participate in daily activities and routines.

> 3. C.W. needs to use syntactic elements in her phrases and sentences in order to communicate her ideas to others.

> 4. C.W. needs to improve her speech skills. She sometimes omits final constant sounds, is not yet consistent in production of back sounds (k, g) and has difficulty with strident (airflow) sounds, such as /sh/, /th/, /f/ and /s/ in words and blends.

15. The IEP identified the following services to meet those needs:

> 1. Early Childhood Intervention Specialist–15 hours per week.

> 2. Speech-Language Pathologist–2.5 hours per week.

> Other related services provided in the IEP were:

> Adults should gain and maintain C.W.'s attention before presenting direction and demonstrations. For production of target sounds, a mirror should be used to help C.W. visually orient her tongue, lips and cheeks for correct placement fo target sounds. Auditory, visual and tactile (touch) cues may be helpful for C.W. to produce sounds correctly. Services will be provided in an acoustically quiet environment with an assistive listening devise. Modeling and imitation is to be provided throughout the preschool day.

(CPS Ex. 10). The IEP identified the least restrictive environment for provision of these services

to be a preschool education classroom with typically developing peers included. *Id.*

16. The Wilhelmys disagreed with the recommended placement of C.W. in a CPS setting. The

2006-2007 IEP was implemented at Ohio Valley Voices and paid for by CPS.

5

17. May 2007 tests performed by the Speech Pathology Department at Cincinnati Children's Hospital showed C.W. to be in the third percentile for Core Language and in the less than first percentile for Word Structure and Expressive Vocabulary. (CPS Ex. 26).

18. On October 15 and 18, 2007, C.W. underwent an educational evaluation at OVV where she was enrolled as a student. (CPS Ex. 28). C.W.'s oral language scores showed C.W. was significantly behind her same aged hearing peers in the following areas of oral communication: comprehension/use of oral vocabulary words, syntactical structures, and complex sentence structures. *Id.* Secondary to her language delays, C.W. was at risk with literacy development. It was reported that C.W. needs: "continued access to sound and acoustic modifications within her classroom;" "intensive speech and language therapy to develop language skills that will allow her to learn within the general curriculum, plan for higher education, and employment;" and "auditory training so she can maximize the use of her hearing aids/residual hearing and lengthen her auditory memory." *Id.*

19. The OVV assessments were not considered in developing the 2007-2008 IEP for C.W. (Tr. 321).

20. In the fall of 2007, since C.W. was transitioning from pre-school to kindergarten, CPS conducted a new Multi-Factored Evaluation. (CPS Exs. 18, 19; Tr. 290-91). At the time, C.W. was attending a full-day program at OVV.

21. The 2007 Multi-Factored Evaluation included an audiologic assessment. The assessment revealed a hearing impairment of greater than 50 dB in each ear qualifying C.W. for special education services under the disability category of Hearing Impaired. (CPS Ex. 18). Susan M. Almer, the CPS Audiologist, reported that C.W. needs to use amplification to gain instructional

6

information through audition. In group instructional settings, she needs preferential seating and appropriate lighting to provide access to visual information (speech-reading, visual cues, visual teaching aids, video materials); reiteration of verbal responses from students by the teacher to assist in following classroom conversations; and a quiet non-reverberative acoustic environment to reduce noise and reverberation of sound that interferes with speech discrimination. *Id.* C.W. also benefitted from the use of an assistive listening device (FM system[1]) for group instruction. *Id.*

22. Ms. Almer testified that in terms of the least restrictive environment for C.W.'s placement, C.W.'s hearing impairment did not preclude placement in the general education setting at CPS provided she received support, accommodations, and assistive listening equipment. (Tr. 364).

23. Marietta A. Hummons, M.Ed., an educator with CPS, assessed C.W.'s gross/fine motor skills, self-help skills, speech and language skills, general knowledge and comprehension, readiness, basic reading, manuscript, and basic math. (CPS 18; Tr. 409). C.W. demonstrated scattered success with mastery of the Early Learning Content standards and the Kindergarten Standards. Although C.W. had mastered many of the readiness concepts and these skills appeared to be emerging, she demonstrated difficulty with recognition of some of the letters of the alphabet and with phonemic awareness. C.W. also demonstrated some difficulty answering "wh" questions requiring her to formulate her thoughts without a prior language model. C.W. appeared to lack confidence in her ability to provide a correct response to questions about unpracticed information even when she understood the concepts. C.W. appeared very

---

[1]A Frequency Modulator (FM) system is a transmitter-receiver system whereby the speaker wears a microphone that transmits speech to a receiver connected to the hearing aids worn by the child. (Tr. 343).

comfortable in her small class setting and structured learning environment. However, when expected to demonstrate her knowledge in a different setting, she appeared to be unsure of herself. Ms. Hummons concluded that C.W. would perhaps benefit from an inclusive learning environment with opportunities to interact with her peers and transfer concepts and skills that she has mastered to a variety of curriculum content areas and situations. (CPS Ex. 18, Tr. 412). Ms. Hummons testified that she believed there were no reasons C.W. could not be successful in a regular CPS classroom with appropriate modifications. (Tr. 414). She also testified that C.W. would receive an educational benefit from being in a regular classroom by being given a greater opportunity to interact with peers who are typically developing and to engage in more unstructured learning situations where spontaneous learning occurs. (Tr. 414, 424-25).

24. The 2007 MFE also included an assessment of C.W.'s general intelligence, academic performance, and social and emotional status by Angela Nichols, Ph.D., a CPS school psychologist. (Tr. 525). C.W. was administered the Wechsler Preschool and Primary Scale of Intelligence. (CPS Ex. 18). C.W. obtained a verbal IQ of 78, a performance IQ of 114, and full scale IQ of 95. Dr. Nichols reported that verbal subtests measured C.W.'s ability to verbally express herself, perceive logical relationships, and use language and math symbols. Dr. Nichols reported that the verbal scale requires use of auditory and memory skills and is usually more predictive of academic success. The performance subtests measured C.W.'s ability to think and solve problems in practical, concrete, and manipulative situations requiring visually cued "hands-on" activities. Dr. Nichols concluded that C.W. possessed the cognitive skills needed to experience success in a regular educational environment with appropriate support including accommodations and modifications to address her hearing loss and academic skill deficits. (CPS

8

Ex. 18; Tr. 532, 537).

25. Dr. Nichols also administered the Dynamic Indicators of Basic Early Literacy Skills assessment to C.W. Testing showed C.W. had phonemic awareness skill deficits. (Tr. 535). C.W. scored five correct initial sounds per minute. Dr. Nichols testified that children who score below ten correct initial sounds per minute are considered at risk of not being on the proper reading trajectory for reading fluently by the end of third grade. (Tr. 535-36). As a result of this testing, Dr. Nichols felt it was appropriate to include phonemic awareness as a goal in C.W.'s IEP. (Tr. 536).

26. Dr. Nichols opined that given C.W.'s hearing loss, in a group instructional setting C.W. needs preferential seating and appropriate lighting to provide access to visual information (speech-reading, visual cues, visual teaching aids, video materials); reiteration of verbal responses from students by the teacher to assist in following classroom conversations; and a quiet non-reverberative acoustic environment to reduce noise and reverberation of sound that interferes with speech discrimination. C.W. would also benefit from being provided with frequent opportunities to participate in activities that allow her to practice and receive feedback on phonemic awareness skills. (CPS Ex. 18; Tr. 537).

27. Judy Geiger Colegrove, a CPS Speech/Language Pathologist, assessed C.W.'s communication skills for the 2007 MFE. (CPS Ex. 18). On testing, C.W. obtained an Oral Composite score (an assessment of overall level of oral language functioning) of 78 which was below average when compared to typical peers. C.W. obtained a Listening Comprehension score (which measures comprehension of words and phrases, grammar, and higher order language) of 89 (below average). C.W.'s Oral Expression score (which measures the understanding and use of

9

spoken language) was 71 (below average). Ms. Colegrove concluded that C.W.'s oral communication skills were significantly delayed in comparison of those of typically developing peers particularly in the area of expressive language. (CPS Ex. 18; Tr. 438). Ms. Colegrove explained that in formalized testing based on a mean score of 100 with a standard deviation of 15 for all core language scores, a score of 85 would be considered the low average of the spectrum. (Tr. 438). C.W.'s oral expression score of 71 was "almost two full standard deviations below the mean, which would put her in a significant delay compared to typical peers." (Tr. 439). Ms. Colegrove opined that continued development and expansion of C.W.'s communication skills would positively impact her performance in all academic areas. Expansion of C.W.'s expressive language could be facilitated by adults in the classroom as well as at home. Providing C.W. with expanded verbal models including corrected syntactic structures, descriptors and /or more complex language structures would help reinforce and increase her sentence length. Reading books together, playing with toys, and talking about events/activities/chores were examples of daily activities that lend themselves well to fostering "talk time." Targets could include vocabulary, using basic concepts (location, quantity, and time), following directions, asking and answering questions, making predictions, and talking about simple cause and effect relationships. In addition to adult models, Ms. Colegrove opined that C.W. would benefit from opportunities to practice her emerging expressive language skills with typical peers in informal, pragmatically appropriate, and language-rich situations. These situations could also provide C.W. with opportunities to continue to develop skills to repair communication breakdowns with peers when they occur. *Id.* Ms. Colegrove testified that C.W. could be placed in a typical class with non-hearing impaired children as long as the necessary supports, including speech and language

pathology services, were in place to make her successful. (Tr. 439). Ms. Colegrove testified that

C.W. would receive educational benefits by being in a regular class with non-hearing impaired

children, such as exposure to peer language models which would help support her learning of

different levels of language, not just her grammar or syntactic language skills. (Tr. 439-40).

28. The Evaluation Team Report for the 2007 MFE was summarized as follows:

> C.W. has a documented permanent hearing impairment averaging >50 dB and
> needs to use amplification to gain instructional information through audition. In a
> group instructional setting, she needs preferential seating and appropriate lighting
> to provide access to visual information (speech-reading, visual cues, visual
> teaching aids, video materials); reiteration of verbal responses from other students
> by the teacher to assist in following classroom conversations; and quiet non-
> reverberative acoustic environment to reduce noise and reverberation of sound
> that interferes with speech discrimination. She benefits from the use of an
> assistive listening device (FM system) for group instruction. C.W. has mastered
> many of the kindergarten readiness concepts but has difficulties with recognition
> of some letters of the alphabet and phonemic awareness skills. C.W. continues to
> demonstrate communication skill delays and qualifies for speech/language therapy
> services as a related service.

(CPS Ex. 18).

29. The 2007-2008 IEP stated that C.W. had a moderate to moderately severe hearing loss in her

right ear and mild to moderately severe hearing loss in her left ear, wore binaural hearing aids,

and could detect sounds in the normal to mild range of loss with her hearing aids. In a quiet

setting, C.W. had excellent speech discrimination at a conversational distance of three feet. With

increased distance, her ability to understand speech decreased. Background noise also decreased

her ability to understand speech. (CPS Ex. 19).

30. The 2007-2008 IEP identified four specific needs for which C.W. required specially designed

instruction:

> 1. C.W. needs to formulate responses without a model, answer and tell the use of
> objects.

2. C.W. needs to communicate spontaneously with peers in an unrestricted setting and interact with peers and adults in the classroom.

3. C.W. needs to develop listening skills to gain auditory information for reading phonetically.

4. C.W. needs to continue to develop her correct production of speech sounds to be more easily understood by her peers and adults. Production of later developing speech sound will be monitored throughout the year.

(CPS Ex. 19).

31. The IEP for the 2007-2008 school year provided the following services for C.W.:

1. An Intervention Specialist for one instructional period per week.

2. An Intervention Specialist for the hearing impaired for 240 minutes per month (1 hour per week).

3. A Speech/Language Pathologist for 240 minutes per month (1 hour per week).

4. An Audiologist for 200 minutes per year.

(CPS Ex. 19).

32. The 2007-2008 IEP identified the following related services to be provided to C.W.:

Intervention Specialist will provide direct and indirect service to supplement academic instruction and consult with teachers/staff on learning issues. Intervention Specialist for the Hearing Impaired will monitor assistive listening equipment weekly, provide direct and indirect service to supplement academic instruction and consult with teachers/staff on hearing issues. Speech/Language Pathologist will provide direct and indirect speech/language therapy services, providing appropriate language models, prompts, and visual cues as needed. Audiologist will fit and maintain school's assistive listening equipment. Provide a consistent routine, gain C.W.'s attention before providing demonstrations and directions, use an assistive listening device (FM systems), provide device checks twice daily, provide preferential seating, small group test setting, and extended test time.

(CPS Ex. 19).

33. The 2007-2008 IEP was to be implemented in the general education classroom with small

group/individual work provided in an area of limited distractions. (CPS Ex. 19).

34. CPS proposed to place C.W. at Fairfield German Language School, an alternative/magnet school within the CPS systems. (Tr. 324, 352, 388, 472). C.W.'s placement would be in the century-old Fairview School building, which housed a newer addition built in the late 1950s or early 1960s. (Tr. 369, 506).[2] The old Fairview building had some rooms with acoustical modifications. (Tr. 358).

35. Jennifer McMahon, a CPS intervention specialist for the hearing impaired at Fairview School, testified at the due process hearing. Ms. McMahon is licensed as an assistant superintendent, a principal, an intervention specialist for the hearing impaired, and in elementary education. (Tr. 469-70). She testified that she serves in a dual role as both an intervention specialist and an intervention specialist for the hearing impaired. (Tr. 487). Ms. McMahon testified that children at Fairview School receive German language lessons on a "pull-out" basis which are in addition to the regular academic classes. Children with a hearing loss or hearing impairment are "pulled-out" during German language lesson time to receive the supportive services they require so they do not miss any of their academic classes. (Tr. 474). Ms. McMahon testified that she also coordinates the services that a hearing impaired child receives with the audiologist, the speech/language therapist, the school psychologist, and the speech/language pathologist. (Tr. 474-75).

36. If C.W. would have been placed at Fairview School during the period of her 2007-2008 IEP, she would have been placed in a kindergarten class at Fairview with non-hearing impaired

---

[2] At the time of the hearing, a new Fairview building was under construction and scheduled to open in the fall of 2008. (Tr. 353, 386). The new Fairview building was being built to contemporary acoustic standards. (Tr. 353, 356). However, the new building would not be completed in time for implementation of C.W.'s 2007-2008 IEP at that location.

children. (Tr. 476-77). Ms. McMahon described the benefits of an inclusionary model: exposure to language development from non-hearing impaired peers, acclimation to the classroom routine and activities, exposure to the activities of peers which helps to develop language skills and self-expression, and exposure to appropriate developmental grade-level standards and goals to which the hearing impaired child may aspire. (Tr. 477-78, 495, 499).

37. Ms. McMahon's room for pull-out sessions was located in a newer area of the old Fairview School building with a sound level that was suitable for instruction for someone like C.W.

38. Ms. McMahon trains teachers to ensure they are aware of the importance of proximity to the hearing impaired child for purposes of lip reading, facial expression, and direction. (Tr. 486).

39. In terms of her role as an intervention specialist for hearing impaired children, Ms. McMahon is responsible for determining whether the goals set by the IEP are being met. (Tr. 497). She provides the services and evaluates the efficacy of those services. (Tr. 497). If the IEP fails to allocate a sufficient amount of needed services, the IEP team may meet to revise the IEP. (Tr. 486). McMahon testified that services would not terminate if those allocated in the IEP were exhausted and more were needed by the child. (Tr. 487).

40. In terms of C.W.'s IEP for 2007-2008, Ms. McMahon testified that she believed C.W. needed more than the one hour per week of an intervention specialist and more than 240 minutes per month of a hearing impaired intervention specialist set forth in the IEP. (Tr. 490). She testified that if she were the hearing impaired intervention specialist for C.W., she "would definitely do pull-out" in working with C.W. Ms. McMahon explained:

> At kindergarten stage, they definitely do need to be able to be working one-on-one and to address and clarify what the teacher[']s expectations are, to talk to them, to go over their letters and sounds, to give them more one-on-one attention.

> So that would not–I would definitely have that in there, but I might say that I
> might need to be in there or there might be additional services with an oral
> interpreter needed, and I might need to be coming into the classroom in addition to
> support the child.

(Tr. 510). She explained that an oral interpreter is a trained professional who provides additional

support to the child in the general classroom setting by mouthing the words being spoken by the

teacher and others to clarify the language for the hearing-impaired child. (Tr. 511). McMahon

testified that an oral interpreter provides "excellent support for students who are language

delayed and are having trouble being able to cope in a classroom. . . ." (Tr. 512). She testified

that not all hearing impaired students need an oral interpreter, but some students, because of their

delays, can benefit from the support of an oral interpreter. (Tr. 513). The 2007-2008 IEP for

C.W. did not provide for the services of an oral interpreter. (Tr. 516). McMahon testified that if

she determined C.W. needed the services of an oral interpreter, she would put that in the IEP. (Tr.

516-17).

41. Ms. McMahon testified that she was aware that C.W. was significantly delayed in her

language. (Tr. 513). McMahon testified that she typically gave more time for services to hearing

impaired students than the two hours per week provided in C.W.'s IEP. (Tr. 514). McMahon

stated that she typically spends between 45 minutes to one and one-half hours per day with a

hearing impaired child in providing services. (Tr. 515). McMahon stated that the services in the

proposed 2007-2008 IEP for C.W. would not be an intensive type of program. (Tr. 515).

42. The Wilhelmys were given a tour of the Fairview German Language School. (Tr. 45, 481).

Mr. Wilhelmy did not believe the school was an appropriate placement for C.W.

43. Martin Wilhelmy testified that at the IEP meeting with CPS, he was told the goals for C.W.

could be changed, but they could not increase the amount of services. (Tr. 39). He testified his

goal was to see C.W. in a total, comprehensive, and integrated oral education curriculum that dovetailed into her academic program to enable her to reach her full language capabilities and enter a mainstream environment. (Tr. 61). He stated he believed it was in C.W.'s best interest to remain at Ohio Valley Voices to achieve this goal. (Tr. 61).

44. Angie Sharp, a deaf education teacher at Ohio Valley Voices, testified that she provided speech therapy to C.W. every 30 minutes from 8:30 a.m. to 3:30 p.m. for a total of two and one-half hours per day. (Tr. 113, 117). She testified that she provided speech therapy by "[m]odeling and imitation" throughout the school day. (Tr. 113). Ms. Sharp corrected C.W.'s language, had C.W. repeat it back, and tried to expand C.W.'s sentence length. (Tr. 113). She provided speech therapy to C.W. in a class of three students. (Tr. 114, 117). Therapy was provided in an acoustically appropriate classroom. (Tr. 114). Ms. Sharp explained why modeling language was important for C.W.:

> [I]f she made a statement and it was not correct, and I did not ask her to repeat it and give it back to me, she's not learning how to use that language herself. She would just be hearing me say it and not utilizing it.
>
> And so it's drill all day long, just getting her to use it as often as she can, so that it becomes–I mean she's having to learn how to speak, whereas we just know how to talk. She's having to learn that.

(Tr. 116). Ms. Sharp modeled language in conversing with C.W. one-on-one and during C.W.'s exchanges with her peers in the classroom. (Tr. 119-20).

45. At OVV, C.W. was equipped with an FM system as an auditory aid. (Tr. 117). Ms. Sharp would check the FM system in the morning and every time C.W. would return to her classroom. (Tr. 117).

46. In terms of placement in a general education classroom with non-hearing impaired children,

Ms. Sharp testified that while C.W. could "maybe pick up" what the other students were saying, she would not be learning to acquire the language skills she needs to use on her own without someone correcting her. (Tr. 124).

47. Kerri Howard, the learning center teacher at OVV, was responsible for the academic curriculum for C.W. (Tr. 140-41). Ms. Howard provided lessons in reading, math, science, and social studies to C.W. for three to three and one-half hours per day. (Tr. 141). C.W. was one of seven students for academic classes, with the exception of reading where she was one of two students. (Tr. 142). Ms. Howard was assisted by a teacher's aide for all but the reading classes. (Tr. 143). C.W. was performing math and reading at grade level, *i.e.*, kindergarten. Social studies was harder to assess because of C.W.'s need to use expressive language in conveying her understanding of concepts. (Tr. 143-44). Ms. Howard testified that when C.W. entered kindergarten, she did not know her letters or letter sounds, but made significant progress in that area. (Tr. 144, 146).

48. Ms. Howard's room contained soundboards to help absorb sounds and she utilized an FM system. (Tr. 145-46).

49. Ms. Howard testified that C.W. was shy, struggled to initiate conversation, and definitely did better in smaller groups. (Tr. 147). C.W. was more likely to initiate conversation in a group of only two or three, but worked cooperatively with her peers and followed classroom rules appropriately. Ms. Howard saw C.W. progress given the intensive program C.W. received in language and speech. (Tr. 147-48).

50. Ms. Howard followed State of Ohio Standards in assessing C.W.'s academic goals and progress. (Tr. 156). She had to modify C.W.'s academic goals to reflect C.W.'s disability and

vocabulary deficits. (Tr. 156-57).

51. Maria Sentelik, the executive director of OVV, received her Bachelor's of Science degree in speech pathology and audiology and Master's of Science degree in audiology. (Tr. 163). She testified that as of April 2008, C.W. was not ready to transition from OVV to a general education setting. (Tr. 166). Ms. Sentelik testified that C.W.'s language had "not caught up enough for her to have an appropriate education in a public setting without intensive intervention." (Tr. 166). She based her opinion on C.W.'s evaluations and her experiences and benchmarks that exist at OVV. (Tr. 166). Sentelik testified that C.W. has significant language delays as a result of her hearing impairment and needs intensive therapy to catch up. (Tr. 167).

52. The building which houses OVV was renovated to acoustic standards specifically designed for hearing impaired children to give them the best access to a quiet environment for learning oral language. (Tr. 167-68).

53. At OVV, C.W. was taught using a thirty-minute increment model. C.W. alternated between her deaf education and academic classrooms every 30 minutes. (Tr. 169). C.W. also spent one hour per day in individualized reading instruction. (Tr. 170).

54. Ms. Sentelik reviewed the Wechsler Preschool and Primary Scale of Intelligence administered by Dr. Angela Nichols as part of the MFE. (CPS Ex. 18; Tr. 171). Sentelik testified that C.W.'s verbal IQ of 78 and performance IQ of 114 demonstrated a greater than 10 point gap which is considered significant. Sentelik explained:

> She has a 114 as her performance, which is the portion of the test that does not apply language, the nonverbal portion of the test that she scored a 114, which is above average, I believe. And a verbal IQ of 78, which is below average, and that's a very large gap.
>
> And she [Nichols] reported as well, as I agree, when there's a significant gap like

18

that, that there will be academic challenges for her because she doesn't have the access or the language to support the academics. And they reported that very thing in here.

We look at this test as the performance IQ as being the potential of the child. In other words, if you factor out the deficit the hearing impairment causing the language delay, because she's hearing impaired, and you look at just her performance, when you take language out of it. This is what this child's potential is, you look at her potential as being 114, which is a very good, high score, that she has a large potential to learn, but the language is impeding her because it's so low.

And we look at these differences. We say we should be able to close that gap, and that's how it's usually talked about in the oral/deaf community, so to speak, that that gap can be closed.

Q. How do you close that gap?

A. With intensive instruction. What we recognize is that the key to success for any child with a disability, and including hearing impaired children, is that you identify them young, and you have early intervention.

Q. Okay.

A. So we recognize that if you get to this child young enough, and you do intensive instruction, both for the parents and for the child, that you have a better success rate. So the way to close the gap for [C.W.] would be to continue to get intensive instruction.

(Tr. 171-172).

55. Sentelik described the intensive instruction provided by OVV. The activities throughout the school day are designed to teach hearing impaired children to speak orally and provide them with the language skills they need to access an academic curriculum. (Tr. 176). If the academic instruction is above a child's language level, she cannot receive the same information or content as a child whose language is at-level. Intensive language instruction is "all about language all day long. . . . [Children] need to feel like what's required of them is talking." (Tr. 175, 176). OVV's goal is to advance the language skills of hearing impaired children to those of their non-

hearing impaired peers within a limited period of time, *i.e.*, zero to five years. This requires intensive instruction. (Tr. 198-99).

56. Ms. Sentelik opined that even though the MFE identified C.W. as having significant delays in her oral communication skills, the IEP did not reflect the intensive intervention needed to address those delays. (Tr. 194). Rather, the IEP reflected one for a typical child who had difficulty producing speech sounds. (Tr. 194). Sentelik stated that having an intervention specialist for one hour per week would serve no useful purpose for C.W., and that one hour per week was more of a maintenance tool once a child leaves OVV to ensure things are okay. (Tr. 197). She also questioned the absence of any auditory goals on C.W.'s IEP. She testified that in her 18 years of working with hearing impaired children she had never seen an IEP or service plan without specific auditory goals for a hearing impaired child. (Tr. 189-90, 233-34). Ms. Sentelik also questioned the adequacy of the IEP to meet Audiologist Almer's recommendation for placement in "a quiet non-reverberative acoustic environment to reduce noise and reverberation of sound that interferes with speech discrimination" because the IEP called for placement in a public school setting without specifying an acoustically modified environment. (Tr. 178-79, 252).

57. The cost per school year at OVV is $25,000.00. (Tr. 253).

58. Defendants Martin and Dagmar Wilhelmy disagreed with the 2007-2008 IEP developed by CPS and requested a due process hearing challenging the IEP. C.W. remained at OVV and the Wilhelmys sought tuition reimbursement from December 2007 to October 2008. (CPS Exs. 19, 20).

59. The due process hearing was held before Independent Hearing Officer (IHO) Bruce A. Favret. The IHO determined that the Multi-Factored Evaluation was appropriate from both a

procedural and substantive perspective. The IHO also determined that the 2007-2008 IEP was not reasonably calculated to provide an educational benefit to C.W., was not in the least restrictive environment, and therefore was a denial of a free appropriate public education. The IHO further determined that C.W.'s placement at OVV was appropriate and the least restrictive environment. Finally, the IHO determined that the $25,000 per year tuition at OVV was reasonable. The IHO ordered CPS to pay C.W.'s tuition at OVV from December 4, 2007 to October 17, 2008 up to a maximum of $25,000. The IHO also ordered CPS to either provide transportation for C.W. to OVV or to reimburse her parents for transportation costs.

60. CPS appealed the decision of the IHO to State Level Review Officer (SLRO) Robert L. Mues. CPS raised nine assignments of error on appeal. The SLRO sustained the second assignment of error, while overruling the remaining eight assignments of error. The SLRO determined that the proposed IEP failed to offer the intensive instruction C.W. needs to obtain a meaningful educational benefit. The SLRO affirmed the Order of the IHO requiring CPS to pay Ohio Valley Voices for C.W.'s tuition for the period from December 14, 2007 to October 17, 2008 up to the sum of $25,000 and to provide transportation or reimbursement for transportation for C.W. to and from OVV starting from the date of the IHO decision.

## THE IDEA AND STANDARD OF REVIEW

"The Individuals with Disabilities Education Act[3] . . . requires States receiving federal funding to make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State, § 1412(a)(1)(A)." *Forest Grove School Dist. v. T.A.*, 129 S.Ct.

---

[3]The IDEA was enacted in 1970 as the Education of the Handicapped Act and renamed the Individuals with Disabilities Education Act in 1990. *Forest Grove School Dist. v. T.A.*, 129 S.Ct. 2484, 2491 n.6 (2009) (citing § 901(a), Pub. L. 101-476, 104 Stat. 1142).

21

2484, 2487-88 (2009). The Act defines a free appropriate public education as special education and related services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). The IDEA was enacted to guarantee children with disabilities "a free appropriate public education that emphasizes special education and related services[4] designed to meet their unique needs and prepare them for further education, employment, and independent living." *See* 20 U.S.C. § 1400(d)(1)(A).

In furtherance of this goal, a school system conducts an initial evaluation of a child to determine the presence of a disability and the necessity for special education or related services. 20 U.S.C. §§ 1414(a), (b). School districts must establish an Individual Education Plan (IEP) for each child with a disability. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Deal*, 392 F.3d at 853 (quoting *Knable v. Bexley City*

---

[4]"The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." *Cedar Rapids Community School Dist. v. Garret F. ex rel. Charlene F.*, 526 U.S. 66, 69 (1999) (citing 20 U.S.C. § 1401(a)(17)).

*Sch. Dist.,* 238 F.3d 755, 763 (6th Cir. 2001)). The development of the IEP is a team effort,

consisting of input from teachers, special educators, the child's parents, a representative of the

school district, and other individuals with special expertise. 20 U.S.C. § 1414(d)(1)(B). The

IDEA sets forth procedural safeguards allowing parents or the school district to request a due

process hearing to contest "any matter relating to the identification, evaluation, or educational

placement of the child, or the provision of a free appropriate public education to such child." 20

U.S.C. §§ 1415(b)(6)(A), (f), (k). Where a school fails to provide a free appropriate public

education through a proposed IEP that is inadequate to meet the unique educational needs of the

child, the IDEA authorizes a court to "grant such relief as the court determines is appropriate,"

including reimbursement for the cost of private education when a parent or guardian unilaterally

enrolls a child in private school. *School Comm. of Burlington v. Dept. of Ed. of Mass.,* 471 U.S.

359, 370 (1985); 20 U.S.C. § 1415(i)(2)(C)(iii).

The IDEA was amended in 1997 "to place greater emphasis on improving student

performance and ensuring that children with disabilities received a quality education." *Forest

Grove School Dist. v. T.A.,* 129 S.Ct. 2484, 2491 (2009) (quoting S. Rep. No. 105-17, p. 3

(1997)). Congress recognized that while states had made substantial gains in special education

for children with disabilities, "more needed to be done to guarantee children with disabilities

adequate access to appropriate services." *Id.* Thus, "the IDEA requires an IEP to confer a

'meaningful educational benefit' gauged in relation to the potential of the child at issue." *Deal v.

Hamilton County Bd. of Educ.,* 392 F.3d 840, 862 (6th Cir. 2004). As the Sixth Circuit

explained, "Only by considering an individual child's capabilities and potentialities may a court

determine whether an educational benefit provided to that child allows for meaningful

advancement. In conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children." 392 F.3d at 864.

In determining whether CPS, through its proposed IEP, provided C.W. with a free appropriate public education for the 2007-2008 school year, the Court examines procedural and substantive issues:

> First, the court determines whether the state has complied with the procedures set forth in the IDEA. *See Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Second, the court assesses whether the IEP developed through the act's procedures is reasonably calculated to enable the child to receive educational benefits. *See id.* at 206-07.

*Burilovich v. Board of Educ. of Lincoln Consolidated Schools*, 208 F.3d 560, 565 (6th Cir.), *cert. denied*, 531 U.S. 957 (2000). *See also N.L. ex rel. Mrs. C. v. Knox County Schools*, 315 F.3d 688, 693 (6th Cir. 2003). In this case, the parties do not dispute that the State complied with the procedures set forth in the Act. Rather, the issue in this case centers on whether the IEP was reasonably calculated to provide a meaningful educational benefit to C.W., a question both the IHO and SLRO answered in the negative.

In examining this latter issue, the Court must apply a "modified de novo" standard of review to the findings of fact made in the state administrative action. *See Knox County Schools*, 315 F.3d at 692; *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). "Under a modified de novo standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings, particularly when educational expertise is essential to the findings." *Knox County Schools*, 315 F.3d at 692 (citing *Knable*, 238 F.3d at 764; *Burilovich*, 208 F.3d at 566). The Court is required to make an "independent decision" based on

a preponderance of the evidence while giving "due weight" to the findings of the state administrative agency.[5] *Rowley*, 458 U.S. at 205, 206. In *Burilovich*, the Sixth Circuit clarified the "due weight" to be given by the district court to the state agency findings:

> Because administrative findings in IDEA cases should be afforded less deference than that given to agencies under the substantial evidence test, and in view of the IDEA's preponderance of the evidence standard, we hold that administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.

*Burilovich*, 208 F.3d at 567. *See also Board of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 312 -313 (6th Cir. 2007). Where a state has a two-tiered system of review like Ohio, the Court gives due weight to the final decision of the state decision-maker, in this case the State Level Review Officer. *See Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir. 1990). *See also Burilovich*, 208 F.3d at 567 ("when there is a conflict between the holdings of the local and state hearing officers, the court must defer to the state hearing officer's decision in reviewing the record on appeal"). The burden of proof rests with CPS, the party who appealed the decision of the State Level Review Officer. *See Schaffer v. West*, 546 U.S. 49, 56-58 (2005).

## ANALYSIS

CPS attacks the state agency decision on several fronts.[6] Since the SLRO sustained CPS's assignment of error regarding whether C.W. would "regress" in a general education

---

[5] While the Court may hear additional evidence at the request of a party, 20 U.S.C. § 1415(i)(2)(C), the parties in this case agree that the Court may base its decision on the existing record without the need for additional evidence.

[6] CPS argues the issues in terms of the errors made by the Independent Hearing Officer. The Court must give due weight to the final decision-maker in this case, which is the State Level Review Officer and not the Independent Hearing Officer. *Thomas*, 918 F.2d at 624. Nevertheless, since the State Level Review Officer affirmed the Independent Hearing Officer on all but one of the nine issues raised by CPS, the Court construes CPS's brief as raising the same assignments of error with regard to the decision of the State Level Review Officer.

classroom, the Court finds no reason to address this assignment of error. (SLRO Decision at 6-7).

First, CPS contends the IHO's conclusion that the 2007-2008 IEP would provide only a "trivial educational benefit" to C.W. is contrary to the overwhelming evidence. (Doc. 13 at 7). CPS points to its "highly qualified and experienced educators" who testified that C.W. would receive an educational benefit from being mainstreamed into a regular classroom and that exposure to peer language models would allow C.W. to improve her language skills in ways not available to her in an environment of only hearing-impaired peers. (Doc. 13 at 7).

The IHO's finding, in context, states, "The IHO finds that the proposed 2007-2008 IEP is calculated, at best, to provide trivial educational benefit *from interaction with typical peers*." (IHO Decision at 28) (emphasis added). It is clear that the IHO was addressing the relative educational benefit C.W. would receive from interaction with her non-hearing impaired peers vis-a-vis her need for intensive oral speech therapy in a one-on-one or segregated setting to "close the gap" between her significantly delayed communication skills and her learning potential. The IHO did not dispute that C.W. could receive some minimal benefit from exposure to her non-hearing impaired peers. But, when reviewing all of the evidence in light of C.W.'s unique needs and circumstances, including the limited window of opportunity to "close the gap" between C.W.'s receptive and expressive language abilities, this minimal benefit in conjunction with the other proposed services in the IEP did not provide C.W. with a meaningful educational benefit.

It is undisputed that C.W. suffers from moderate to severe hearing loss which was not diagnosed until the age of three. As a result of the delayed diagnosis, C.W. was not given auditory aids or therapy until she was three years old.

26

It is also undisputed that C.W. was significantly delayed in her oral communication skills in comparison with those of her typically developing peers, particularly in the area of expressive language. CPS testing showed her oral expression score was approximately two standard deviations below the mean. (Tr. 439). Testing by Cincinnati Children's Hospital showed C.W. was in the third percentile for Core Language and in the less than first percentile for Word Structure and Expressive Vocabulary. (CPS Ex. 26). OVV testing likewise demonstrated C.W. was significantly behind her same aged peers in oral communication. (CPS 28). Psychological testing showed a greater than ten point differential between C.W.'s performance IQ and verbal IQ, demonstrating that C.W. had a high learning potential, but was significantly delayed in the language skills needed to achieve that potential. (CPS Ex. 18; Tr. 532, 537, 172). The evidence also showed that C.W. had significant deficits in phonemic awareness skills which put her at risk of failing to meet the proper trajectory for reading fluency by third grade. (Tr. 535-36).

The delays C.W. experienced are significant because of the limited window of opportunity which remained for C.W. to learn how to speak orally. Children are most receptive to learning language before the age of six when their brains are most malleable. (Tr. 19-20, 378). The potential for learning language abilities is greatest from birth to three years of age, then from three to five years of age. (Tr. 378). Since C.W.'s diagnosis was delayed until she was three years old, she did not gain any language abilities for that first critical period for language development. Given her delayed diagnosis, C.W. was considered at risk for language development and of not being able to speak orally. The evidence convincingly showed C.W. had a limited window of opportunity to "close the gap" between her receptive and expressive language skills.

The IHO and SLRO determined that the 2007-2008 IEP failed to provide the intensive therapy needed to close this gap. Nor did the IEP provide for the reiteration services and environmental concerns identified in the MFE. These conclusions are supported by a preponderance of the record evidence.

CPS witnesses opined that C.W. would receive an educational benefit from being mainstreamed into a general education classroom and through exposure to peer language models from her non-hearing impaired classmates.

On the other hand, testimony from the Director of Ohio Valley Voices and Jennifer McMahon, a CPS intervention specialist for the hearing impaired, indicated that C.W. needed intensive therapy to close the gap between her receptive and expressive language skills. This included intense one-on-one language modeling from adult teachers in a quiet environment conducive to language discrimination by C.W. (Tr. 172, 175-79, 509).

The IHO and SLRO recognized a conflict in the educational methods proposed by the two parties: mainstreaming with educational supports vs. intensive therapy in a small group segregated setting. The resolution of these conflicting approaches is a matter where educational expertise is relevant and entitled to due deference by this Court. *Deal,* 392 F.3d at 865.

In addition, the IHO was in the best position at the due process hearing to assess the credibility of the witnesses who testified about each method. He chose to give greater weight to the witness evidence showing that intensive intervention was critical to closing the gap between C.W.'s receptive and expressive language skills in the short window of opportunity available. Under the IEP proposed by CPS, C.W. would get three hours of services during the school week. Intervention Specialist McMahon testified that the IEP proposed by CPS was not an intensive

program and provided less service time to C.W. than the 45 minutes to one and one-half hours that McMahon normally provides on a *daily* basis to her hearing impaired students. (Tr. 515). CPS contends that McMahon's testimony is speculative since she never met C.W. and was never involved in the IEP process. (Doc. 13 at 9). Yet, McMahon has a Master's Degree in education, in special education for the hearing impaired, and in elementary education. (Tr. 470). She has worked as an Intervention Specialist for the Cincinnati Public Schools for several years, with at least four of those years as an intervention specialist for the hearing impaired. (Tr. 471-72). She reviewed the MFE and IEP before testifying. (Tr. 480). She was CPS's witness, questioned extensively about her opinions and the underlying basis for those opinions, and provided detailed answers which were subject to cross-examination. Her opinions do not lack a reliable foundation as CPS argues and she was qualified to testify about the amount of direct intervention specialist services C.W. would need. The IHO found the testimony of Ms. McMahon, a teacher on the frontline of implementing IEP services for hearing impaired students on a daily basis, "to be very credible." (IHO Decision at 26). The IHO was free to give McMahon's testimony the weight he saw fit and this Court will not second guess that credibility determination.

The 2007-2008 IEP also failed to provide services to meet the need for reiteration of verbal responses identified in the MFE. (CPS Ex. 18). The MFE stated that C.W. needed "reiteration of verbal responses from students by the teacher to assist in following classroom conversations." (CPS 18). This need was recommended by CPS Audiologist Almer, CPS Dr. Nichols, and in the MFE team summary. (CPS 18). Yet, the IEP proposed by CPS provided for

only three hours per week of specialist intervention (CPS Ex. 19)[7] and failed to provide specific strategies to meet C.W.'s need for reiteration. (Tr. 194, 197, 490, 514-15). The evidence shows that peer language modeling without correction by an adult would not enable C.W. to learn the language skills necessary for expressive language. (Tr. 124). Nor did the IEP address the need for a "quiet non-reverberative acoustic environment to reduce noise and reverberation of sound that interferes with speech discrimination" identified by the 2007 MFE team. (CPS 18; Tr. 178-79).

There is a limited window of opportunity for C.W. to access the language and speech skills she needs to become an oral speaker. The evidence shows that without intensive therapy, C.W. will be unable to close the gap between her receptive and expressive language skills. The 2007-2008 IEP does not reflect the intensive intervention needed to give C.W. a meaningful educational benefit and therefore fails to provide C.W. with a free appropriate public education under the Act.

Next, CPS argues that the IHO improperly concluded that CPS must provide C.W. with a full time oral interpreter and/or intervention specialist in the regular education classroom. (Doc. 13 at 8). The Court agrees with the SLRO in this regard that CPS has taken the IHO's statement out of context. (SLRO Decision at 7). There is no evidence that C.W. needed a full time oral interpreter. In considering the need for reiteration of verbal responses from other students by a teacher in a group setting in a general education classroom, the IHO was merely pointing out that the services provided in the IEP were insufficient to meet this need in comparison to the overall

---

[7]The IEP provided for an Intervention Specialist for one instructional period per week (45-50 minutes), an Intervention Specialist for the hearing impaired for 240 minutes per month (1 hour per week), a Speech/Language Pathologist for 240 minutes per month (1 hour per week); and an Audiologist for 200 minutes per year (approximately five minutes per week). (CPS Ex. 19; Tr. 514).

intensive learning environment that already existed at OVV.

CPS also takes issue with the IHO's reference in his decision to the CHIPP program as providing "an excellent background for evaluating" the 2007-2008 IEP. (Doc. 13 at 9-10). Whether or not the CHIPP program provided useful background information, there is no evidence the IHO or the SLRO relied on the CHIPP program for the conclusion that the IEP proposed by CPS failed to provide a meaningful educational benefit to C.W. Therefore, CPS's contention is without merit.

CPS further contends that the IHO's conclusion that the 2007-2008 IEP "reflects an IEP for a typically developing child who had difficulty producing speech sounds" is not supported by the evidence. (Doc. 13 at 10). In context, the IHO's decision states:

> C.W. has above average ability and potential as shown by her performance score on the MFE. The window of opportunity for her to become a totally oral speaker is very short. C.W. needs intensive intervention if she is going to attempt to close the gap between her receptive and expressive language skills. The proposed IEP does not reflect intensive intervention. It reflects an IEP for a typically developing child who has difficulty producing speech sounds. (Tp 194).

(IHO Decision at 27-28).

The IHO relied on the testimony of Maria Sentelik in finding that C.W.'s IEP reflected one for a typical child with trouble producing speech sounds. (Tr. 194). CPS contends that Sentelik does not qualify as an "educational expert" under Federal Rule of Evidence 702[8] and

---

[8] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

that the IHO's reliance on her opinion was erroneous as a matter of law.

The Court disagrees. Rule 702 applies not only to scientific testimony but also to other types of expert testimony based on technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999); *First Tenn. Bank National Assn. v. Barreto*, 268 F.3d 319, 332 (6th Cir. 2001) (applying *Kumho Tire* to witness whose expertise arose from experience). Ms. Sentelik is the founding director of Ohio Valley Voices and has been the director of the program for eight years. She has a Bachelor's degree in speech pathology and audiology, a Master's degree in audiology, course work for her Ph.D. in literacy and language development for children, and a teaching certificate issued by the Ohio Department of Education to non-public school educators. (Tr. 211-12). As the director of OVV, she helped design the program content for the school. She has a relationship with 22 of 23 school districts OVV serves and has provided services to public school teachers and assistance in developing IEPs for children transitioning from OVV to the public schools. (Tr. 244-45). She has attended numerous IEP meetings and has 18 years of experience working with hearing impaired children and reviewing IEPs and service plans for those children. (Tr. 186, 233-34). Ms. Sentelik's specialized knowledge, training, and experience in the education of hearing impaired children amply qualify her to render an expert opinion on the adequacy of C.W.'s proposed IEP. The fact that she may not have been licensed by the State of Ohio in *public* education affects the weight and credibility of her testimony, not its admissibility as CPS argues. *See Barreto*, 268 F.3d at 333.

CPS also contends the IHO erred when he concluded that C.W. benefits from "intensive intervention" in a "segregated setting." (Doc. 13 at 13).

Once again, the IHO's finding must be read in the context of and in comparison with the benefit C.W. would receive from being mainstreamed:

> [T]he benefits for C.W. from being mainstreamed with her typical peers are minimal when compared to the benefits of an intensive program in a segregated setting. At this point in her educational career, the benefit of an intensive language program, which will enable her to learn how to make speech sounds and to learn how to speak orally, outweighs the minimal benefit of being in a general classroom with her peers. C.W. needs to be able to hear and discriminate the different sounds in oral language so that she will be able to understand what is being said and then she will be able to learn.

(IHO Decision at 28-29).

The Sixth Circuit has recognized that mainstreaming does not always provide the educational benefit intended by the IDEA because "some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming [or] because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting. . . ." *Rocker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983). Without first acquiring the language and auditory skills she needs, C.W.'s academic progress will be impeded "because she doesn't have the access or the language to support the academics." (Tr. 171). If the academic instruction is above C.W.'s language level, she cannot receive the same information or content she needs to learn. (Tr. 177). The preponderance of the evidence in the record shows the intensive instruction needed by C.W. to close the gap during the limited, critical time period for acquiring language could not be provided under the proposed IEP, but could be provided by OVV.

Next, CPS argues that Ohio Valley Voices is not the least restrictive environment for C.W. and the IHO's finding to the contrary is unsupported by the evidence. (Doc. 13 at 19). CPS

claims that OVV is not the least restrictive placement for C.W. because OVV enrolls only hearing impaired children and C.W. has no contact with typically developing peers.

"[T]he least restrictive environment is a mandate favoring mainstreaming, that is, the education of disabled children alongside non-disabled children to the maximum extent appropriate for the individual child." *McLaughlin v. Holt Public Schools Bd. of Educ.*, 320 F.3d 663, 671-72 (6th Cir. 2003). The IDEA provides that removal from the general education classroom "occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

As discussed above, CPS's proposed IEP fails to provide the intensive therapy C.W. requires to overcome the significant delays in her speech and language. OVV can provide the intensive services C.W. needs to acquire the necessary skills to close the language gap and enable C.W. to transition to a general classroom. Based on the administrative record before this Court, and giving due deference to the determinations of the IHO and SLRO, the Court finds the preponderance of the evidence in this case supports a finding that OVV is the least restrictive environment for C.W.

Finally, CPS argues the evidence fails to support the state agency finding that CPS should pay for services rendered at Ohio Valley Voices. The Wilhelmys are entitled to reimbursement for C.W.'s placement at OVV if the Court concludes that "the public placement violated IDEA and the private school placement was proper under the Act." *Forest Grove School Dist. v. T.A.*, 129 S.Ct. 2484, 2496 (2009) (quoting *Florence County School District Four v. Carter*, 510 U.S. 7, 15 (1993)). As explained above, the Court determines that CPS failed to provide a free

appropriate public education to C.W. through its proposed IEP.

In addition, the record amply supports a finding that the educational program at OVV is "proper under the Act." A private school placement is proper under the IDEA if the education provided is "reasonably calculated to enable the child to receive educational benefits." *Carter*, 510 U.S. at 11 (citations omitted). Here, OVV can provide an intensive oral speech program in a one-on-one or small group segregated setting. Intensive remedial services are needed to bridge the gap between C.W.'s receptive and expressive language skills in the limited window of opportunity she has for developing oral language. At Ohio Valley Voices, C.W. has received intensive correction, reiteration, and language instruction and has made progress towards improving her speech and language skills. Placement at OVV is therefore proper under the Act. Therefore, the Wilhelmys are entitled to reimbursement of the cost of C.W.'s education up to the $25,000 limit identified by the state agency reviewers and reimbursement for transportation to and from OVV.

Upon review of the record as a whole, giving due deference to the expertise of the state review hearing officers, the Court finds by a preponderance of the evidence that the proposed IEP did not provide C.W. with a meaningful educational benefit.

**IT IS THEREFORE RECOMMENDED THAT** the decision of the State Level Review Officer be **AFFIRMED**.

Date: 11/16/09

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE
CITY OF CINCINNATI,
    Plaintiff

Case No. 1:08-cv-860
Weber, J.
Hogan, M.J.

vs

MARTIN WILHELMY, et al.,
    Defendants

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).